1

2

3

4                       UNITED STATES DISTRICT COURT

5                     NORTHERN DISTRICT OF CALIFORNIA

6

7    DEBRA J. EISNER,                          Case No.  12-cv-01238-JST
              Plaintiff,
8
        v.                                     **ORDER RE: CROSS-MOTIONS FOR**
9                                              **JUDGMENT AS A MATTER OF LAW**
     THE PRUDENTIAL INSURANCE
10   COMPANY OF AMERICA,
              Defendant.
11

12

13          In this appeal of the denial of disability benefits under an ERISA plan, the parties have

14   filed cross-motions for judgment as a matter of law.  The Court held a bench trial on December 6,

15   2013.  The Court will grant in part and deny in part Plaintiff's cross-motion and deny Defendant's

16   motion.  The following constitutes the Court's Findings of Fact and Conclusions of Law pursuant

17   to Federal Rule of Civil Procedure 52(a).

18   I.     FACTS

19          A.     Plaintiff's Employment

20          Plaintiff Debra Eisner, born 1956, was employed by Surgical Care Affiliates as an

21   "Administrator - SC."  R. 303, 362.  She was hired by Surgical Care in 1991. R. 389.[1]  An

22   Administrator - SC "[d]irects the development of short and long range objectives, budgets, and

23   operating plans for the center" and "[a]dministers, directs, and coordinates all activities of the

24   surgery center to carry out its objectives in the provision of  health care, and participation in

25   _____

26   [1] The most recent description of her position in the claim record is dated March 13, 2001.  In June
     2010, Surgical Care's Vice President of Operations for Southern California sent a letter to
27   Plaintiff's allergist requesting his opinion as to Plaintiff's "ability to perform the essential
     functions of her position."  The position description attached to the letter lists the position as
28   "Center Administrator."  That description does not differ meaningfully from the description for an
     "Administrator - SC."  R. 205–07.

United States District Court
Northern District of California

community health programs." R. 303. Under the heading "Environmental conditions," the position description provides that administrators are "[s]ubject to long, irregular hours; occasional pressure due to multiple calls and inquiries." R. 304. The positions' physical requirements include: "[o]ccasional pushing, pulling, bending, and lifting; sitting, standing, some travel required. Must meet physical requirements for appropriate position description if providing direct patient care." Id.

Plaintiff stopped working on March 15, 2010, "due to symptoms of chronic fatigue syndrome, myalgia and mytosis, allergic rhinitis, hip pain, depression and long history of fibromyalgia." R. 362, 449. In July 2010, Plaintiff submitted a claim to Defendant The Prudential Insurance Company of America for benefits under Surgical Care's group Long Term Disability ("LTD") Plan.

### B.   The Long Term Disability Plan

The LTD Plan defines disability as follows: "You are disabled when Prudential determines that: you are unable to perform the material and substantial duties of your regular occupation due to your sickness or injury; and you are under the regular care of a doctor; and you have a 20% or more loss in your monthly earnings due to that sickness or injury." R. 58 (emphasis omitted). After twenty-four months, LTD coverage will extend to claimants only if are "unable to perform the duties of any gainful occupation for which [they] are reasonably fitted by education, training or experience" as long as they are under the regular care of a doctor. Id. (emphasis omitted).

Under the Plan, "material and substantial duties" are duties that "are normally required for the performance of [the claimant's] regular occupation; and cannot be reasonably omitted or modified," except that Prudential considers claimants able to perform the requirement of working in excess of forty hours per week even if claimants are required to work, on average, more than forty hours a week. Id. "Regular occupation" means the occupation a claimant is "routinely performing" when the disability begins, with regard only to how the occupation is "normally performed instead of how the work tasks are performed for a specific employer or at a specific location." Id.

The Plan requires a claimant's disability to remain continuous throughout the "elimination

1   period" of 180 days or the length of time for which the claimant receives short term disability

2   benefits or sick leave, whichever is longer.  R. 60.  The Plan considers a disability continuous if

3   the disability "stops for 30 consecutive days or less during the elimination period."  Id.

4       The Plan also limits benefits to twenty-four months for sicknesses or injuries "primarily

5   based on self-reported symptoms."  R. 68.  The self-reported symptoms limitation was the subject

6   of an earlier Order of the Court, in which the Court found that the limitation does not apply to

7   Plaintiff's diagnosis of fibromyalgia.  ECF No. 50.

8       Prudential denied Plaintiff's claim on November 23, 2010, and denied her appeal of that

9   denial on February 28, 2012.  Plaintiff filed this appeal of that decision on March 12, 2012.

10      **C.     Plaintiff's Medical Records**

11      In evaluating Plaintiff's disability claim, Prudential obtained medical records from three of

12  Plaintiff's treating physicians: Dr. Marian Beshara, Plaintiff's primary care physician; Dr. Geetha

13  Paladugu, Plaintiff's Psychiatrist; and Dr. Richard Munson, Plaintiff's allergist.  In support of her

14  appeal of the initial denial of benefits, Plaintiff submitted additional medical evidence: a report

15  from the Pacific Fatigue Laboratory, and an independent medical examination and file review

16  performed by Dr. Stuart Silverman.  Prudential also obtained additional records from Doctors

17  Munson and Paladugu during the pendency of the appeal.

18      **1.     Medical Records from Dr. Beshara**

19      Dr. Beshara's medical records pertaining to Plaintiff range from 2008 to 2011.  They

20  reveal a years-long struggle to identify a satisfactory treatment for Plaintiff's symptoms — in

21  particular, Plaintiff's chronic fatigue and fibromyalgia.

22      On January 18, 2008, Dr. Beshara saw Plaintiff for a follow-up on her fibromyalgia.  Dr.

23  Beshara wrote: "The problem is since December the fibromyalgia is acting up on her and she has

24  pain and she read about Lyrica and she wants to try it . . . ."  R. 316.  Dr. Beshara put Plaintiff on

25  Lyrica twice a day "to see if this can help or not."  Id.  In April 2008, Dr. Beshara again noted that

26  Plaintiff's "only complaint is she feels fatigued most of the time."  R. 317.  Dr. Beshara saw

27  Plaintiff again on April 23, 2008, because she had a colonoscopy that led to fever and abdominal

28  pain.  R. 315.  After visiting the emergency room, Plaintiff underwent surgery due to a perforation

United States District Court
Northern District of California

United States District Court
Northern District of California

of the colon and signs of peritonitis stemming from the colonoscopy.  "Now, she says she is doing well except she feels still fatigued and tired.  She went back to work after 6-1/2 weeks of time off, and she is working around 7 to 8 hours a day but she still feels tired when she goes home."  Id. Dr. Beshara noted that Plaintiff's fibromyalgia was better controlled on Lyrica and surmised that her fatigue could be due to the operation.

In September 2008, Plaintiff saw Dr. Beshara due to a rib fracture sustained in a boating accident.  R. 314.  Dr. Beshara again noted that Plaintiff's fibromyalgia was "currently controlled."  Id.  Dr. Beshara also noted that "she feels like she is too much stressed out.  She feels like depressed.  She wants to adjust her medications."  Id.

In October 2008, Plaintiff followed up again concerning her fibromyalgia and depression. Dr. Beshara noted: "Last time, she was more depressed and more tired.  Her depression mainly arising from her feeling tired all the time.  The patient went through a lot . . . .  Last time, we switched her from Celexa to Cymbalta to help her with the fibromyalgia and chronic fatigue syndrome, but she does not feel any better as per her now . . . ."  R. 313.  Dr. Beshara adjusted Plaintiff's medications again.

In November 2008, Plaintiff again followed up on her fibromyalgia.  Dr. Beshara noted the Cymbalta did not stem Plaintiff's fatigue.  R. 311.  Dr. Beshara's assessment and treatment plan noted that the fatigue could be multifactorial, and set a plan to check several of Plaintiff's organ functions.  Id.  Dr. Beshara also noted that the fatigue "started since she had the colonoscopy . . . ." Id.  The note indicates that Plaintiff's pain was "controlled" but fatigue "still continues."  Id.

Dr. Beshara's January 2009 note indicates Plaintiff began to feel better through a diet and exercise program.  R. 310.  In February, however, Dr. Beshara noted: "She still has the chronic fatigue which is bothering her with the fibromyalgia."  R. 308.

The next note in the file from Dr. Beshara is dated October 4, 2010.  It indicates that Plaintiff still suffered from chronic fatigue syndrome.  R. 131.  "It is not as bad as when she was working, stressful job, but she still has it . . . .  The fibromyalgia as far as the pain is controlled. The only problem, the chronic fatigue which she has which is not improving a lot[sic]."  Id.

Finally, after a February 2011 visit, Dr. Beshara noted: "The patient still has the same

problem she has every time, which is the chronic fatigue.  The patient had seen Dr. Munson, her

allergist, and also he tried to treat her with many other modalities for her fibromyalgia.  Gave her

disability, and she is currently on disability, which is true, she is not that functioning good,[sic]

even enjoying her time off, actually, still even most of the day lying in bed and staying in bed as

per her." R. 129.  That last note is the subject of some scrutiny by Prudential, which claims that

Plaintiff is not disabled, in part, because she was "enjoying her time off."  The full note, in

context, paints a different picture, and the phrase "she is currently on disability, which is true, she

is not that functioning good[sic]," shows that Dr. Beshara agreed that Plaintiff was disabled.

### 2.     Medical Records from Dr. Munson

Unfortunately, all of Dr. Munson's progress notes are handwritten and largely illegible;

indeed, Dr. Silverman noted difficulty in deciphering them as well in conducting his medical

review of Plaintiff's file.  R. 268.  Nevertheless, Dr. Silverman's report indicates that Dr.

Munson's notes report Plaintiff suffered from headaches, pain, and fatigue due to fibromyalgia

throughout 2009 and 2010. R. 267–68. Dr. Munson also submitted an Attending Physician

Statement to Prudential at the time Plaintiff submitted her disability claim.  In it, Dr. Munson

described Plaintiff's "severe fatigue" as the reason she could not return to work.  R. 386.

In addition, by letter dated July 1, 2010, Dr. Munson wrote to Surgical Care that he could

not determine when Plaintiff would be "physically able to perform the job duties of an

administrator.  She indicated that she was placed on a Personal Leave of Absence with Surgical

Care Affiliates effective June 7, 2010.  At this time my recommendation is for her to continue on a

leave of absence."  R. 211.

### 3.     Medical Records from Dr. Paladugu

Dr. Paladugu's initial evaluation of Plaintiff is dated March 30, 2009.  It indicates Plaintiff

presented with depressed mood, agitation, irritability, low energy, poor concentration, and

headaches.  R. 347.  Dr. Paladugu noted that Plaintiff was severely functionally impaired in the

"other primary relationships" and "health/physical well-being" categories, and mildly impaired in

the "work/school" category.  R. 349.

Subsequent progress notes report varying degrees of self-reported energy, appetite, mood,

and well-being.  Consistent, however, was medication for depression and anxiety.  R. 342–46.

Often, too, Plaintiff reported exhaustion.  R. 125, 124.  In June 2010, however, Plaintiff reported

that she had returned to work for ten days after a three-and-a-half month leave and that she was

"unable to function" because she was "exhausted" and that she was "easily fatigued."  R. 336.  In

September 2010, Plaintiff also reported fatigue and low energy.  R. 123.  Dr. Paladugu prescribed

10mg of Ritalin to address the fatigue.  In December 2010 and May 2011, Plaintiff again reported

fatigue.  The last note, from August 2011, reports that Plaintiff's father had passed away, that she

still experienced "some anxiety," and that her pain levels were "under control."  R. 120.

#### 4.      Pacific Fatigue Laboratory Report

The Pacific Fatigue Laboratory evaluated Plaintiff and performed a global functional

evaluation on June 13 and 14, 2011.  The evaluation examined Plaintiff's metabolic,

cardiovascular, pulmonary, and cognitive function via a cardiopulmonary exercise test for baseline

results and a re-test while Plaintiff experienced various physical stressors.  The global functional

evaluation revealed a "moderately to severely impaired" oxygen consumption, abnormal

pulmonary function, which "can result from respiratory muscle fatigue," and an abnormal

recovery time that "should be considered an extreme reaction to physical activity."  R. 244–48.  In

assessing Plaintiff's "maximal effort," the report observes: "There is no evidence of malingering."

R. 244.  Following the re-test, Plaintiff reported "extreme fatigue and increased joint pain.

Additional symptoms included cognitive confusion."  R. 247.  The report concludes that the

"observed physiological abnormalities are inconsistent with poor effort."  R. 248.  Finally, the

report indicates that "[m]ost job tasks will demand more energy than can be aerobically generated

and sustained.  This is both an objective measure of fatigue and a quantifiable limitation of the

patient's ability to function."  Id.  The report is supported by over a dozen references and

publications contained in an appendix that discuss chronic fatigue syndrome and exercise stress

tests.  R. 253.

#### 5.      Dr. Silverman's Independent Medical Examination

Dr. Stuart Silverman is a professor of medicine and rheumatology at the University of

California, Los Angeles and a Fellow of the American College of Physicians and of the American

College of Rheumatology.  He performed an Independent Medical Examination and a review of

Plaintiff's medical records on June 30, 2011.  R. 254.  His evaluation of Plaintiff revealed that

Plaintiff was diagnosed with fibromyalgia in 1995 by an allergist, that she suffered pain in her

fingers, hands, hips, knees, and shoulders, that she had only a partial response to medication, but

that past episodes of pain had resolved, and that the perforation of her colon during the

colonoscopy she had in 2008 was followed by "the development of fatigue."  Id.  At the time of

the evaluation, Plaintiff would wake in the morning to have coffee and feed her cat, then return to

bed.  She would dress in the afternoon and go to sleep by 9:00 p.m.  Id.  On her questionnaire,

Plaintiff reported extreme pain and fatigue, with a 10/10 in the degree, severity, and distress of the

fatigue.  R. 255.  A Beck Anxiety Inventory revealed generalized anxiety disorder.  A BDI

FastScreen revealed "probable depression."  She also reported cognitive impairments, such as

difficulty remembering important past experiences, details at home or work, performing single and

multiple tasks, and concentrating on a book or newspaper.  Id.  Dr. Silverman's report states that

Plaintiff "limits her activities considerably to prevent her pain from getting worse.  The pain

interferes with her relationship with others or her ability to do jobs around the home . . . ."  R. 256.

Dr. Silverman also administered an eighteen-point trigger test for fibromyalgia, which

revealed tenderness in all eighteen points, confirming the fibromyalgia diagnosis.  R. 257.

After reviewing Plaintiff's medical records, Dr. Silverman concluded: "Ms. Eisner appears

at this time totally disabled due to unpredictable fatigue, pain, as well as cognitive dysfunction

related to her fibromyalgia and chronic fatigue."  R. 271.  Dr. Silverman credited the Pacific

Fatigue Laboratory findings.  He also observed that Plaintiff's reports of pain and fatigue "are

reasonably reliable and credible" and that "[s]he is clearly unable, by self-report, to return to her

prior position as a nursing administrator . . . .  Ms. Eisner should be considered totally disabled."

Id.

### D.    Witness Statements

In support of her appeal of the initial denial of disability benefits, Plaintiff and her

significant other, Leonard Sigdestad, submitted narrative statements to Prudential explaining the

effect of Plaintiff's health on her daily life.

7

### 1.    Plaintiff's Statement

Plaintiff's statement explains the history of her medical ailments.  She states she was diagnosed with chronic fatigue syndrome and Epstein-Barr Virus in 1987, at the age of thirty-one. R. 38.  At the time, Plaintiff worked as an administrator for a cardiology group.  Due to her illness, she postponed getting married to her then fiancé, and ultimately called off the engagement because it was difficult for her to "envision being a full marriage partner and a supportive wife."  Id.  She stopped working and received disability benefits in 1988, and returned to work in 1989, after which she continued to work full time until March 2010.  R. 38–39.  From 1989 to 2010, her symptoms "waxed and waned but to some degree [] always existed."  R. 39.  "For months on end [she] could do nothing more than work, eat and sleep.  There is no rhyme or reason as to why [she] would feel better or worse."  Id.  She was diagnosed with fibromyalgia in 1995.  R. 38.

Plaintiff also describes her work history.  She held numerous jobs of progressively increasing levels of responsibility from the time she graduated high school to the time she stopped working at Surgical Care Affiliates.  In 1991, she began work at Surgical Care as a Business Office Manager at the Inland Surgery Center.  R. 39.  By 2000, she had risen to the position of Facility Administrator, which position she held until 2010.  She described her position as prestigious, well-respected, and lucrative; by 2010, she was earning $120,000 in salary and $30,000 in bonuses each year.

Plaintiff identifies the colonoscopy and broken rib as a turning point in her medical history. She had previously started work at 7:00 a.m. so she could meet with surgeons and staff prior to the start of their surgeries.  Over time, she was unable to wake up early and began to arrive at work late.  She also describes her position as an active one that required her to be "out and about in the facility" interacting with medical staff.  Id.  She estimates that she would have "failed" at her job if it had not been for the support of her colleagues.  R. 40.  Though working had always been a part of her self-esteem and identity, Plaintiff wrote that she could not return to work because her energy level was too low and her pain was too great.

Plaintiff met her significant other, Leonard Sigdestad, in 2007.  Though Plaintiff was relatively healthy when they met, her fatigue and pain progressively grew worse.  At first, the

couple maintained an active social life, but as her condition worsened, Sigdestad increasingly cared for her, and she increasingly withdrew from normal life activities.  When the couple visits family, Plaintiff spends the majority of the time in bed.  Though they used to ski together, her fatigue and pain led her to give up skiing, and she reports that the seventy-five minute drive to the mountains was "all [she] could handle."  Id.  Plaintiff goes on to describe numerous other ways in which her condition has prevented her from taking part in family activities.

### 2.   Leonard Sigdestad's Statement

Sigdestad's statement describes Plaintiff, at the time the pair met, as "full of spark, energy and [] a great enthusiasm for life."  R. 36.  Now, Sigdestad states that Plaintiff does not feel well eighty percent of the time when she gets up in the morning.  "Basically, as far as normal activity, she is handicapped."  Id.  Going out to dinner is a "strenuous activity" for her, and will require Plaintiff to sleep twelve to fifteen hours to recover.  Plaintiff no longer cooks because "[t]he most she can do is put food in the microwave."  Id. While Plaintiff "used to be happy about 90% of the time with pain only about 10%," that distribution has now reversed.  Id.  "She used to feel bad about 1 day out of 30; now she feels bad 29 days out of 30."  R. 37.  Sigdestad states that Plaintiff "lives a very limited life now."  Id.

### E.   Prudential's Medical Evidence

After receiving Plaintiff's claim, Prudential ordered a file review, which was performed by Registered Nurse Mashelle L. Krier, an internal clinical consultant.  Prudential denied Plaintiff's disability claim on the basis of Nurse Krier's review.  Subsequently, the medical records Plaintiff submitted in support of her appeal prompted Prudential to order independent medical reviews of Plaintiff's file by a rheumatologist, Dr. Mark Borigini, and a psychiatrist, Dr. Antoinette Acenas.[2]

### 1.   Nurse Krier's File Review

Nurse Krier reviewed Plaintiff's file and wrote an internal SOAP note in Prudential's

---

[2] Drs. Borgini and Acenas are employed by a medical review company called MES Solutions. MES Solutions performs medical reviews for insurance companies such as Prudential.  Garrison v. Aetna Life Ins. Co., 558 F. Supp. 2d 995, 1002 (C.D. Cal. 2008).

United States District Court
Northern District of California

1    system dated November 22, 2010, indicating that Krier did not believe Plaintiff suffered from

2    physical restrictions and limitations.  Nurse Krier reviewed Plaintiff's medical records from

3    Doctors Munson, Beshara, and Paladugu.  R. 406.  Krier noted that Plaintiff's condition did not

4    worsen around the time of her leaving work: "Although, around the [date of disability], the

5    [employee] did have some increase in pain associated with a diagnosis of fibromyalgia and her

6    Neurontin was increased, the symptoms reported at/around the [date of disability] do not appear to

7    be significantly different than they had been since March 2009.  Those symptoms being

8    fluctuations in sleep quality, concentration, agitation and pain."  R. 411.  Krier concluded that

9    "there would be no [restrictions and limitations] related to the following diagnoses/symptoms:

10   myalgia, myositis, fibromyalgia, headache, neck pain, back pain, hip pain, chronic sinusitis,

11   allergic rhinitis."  R. 410.

12       Nurse Krier recommended a number of follow-up measures to further explore Plaintiff's

13   functional capacity, including updating Plaintiff's medical records, sending Dr. Beshara a capacity

14   questionnaire, sending a questionnaire to Dr. Paladugu and updating those medical records,

15   discussing with Plaintiff her stress at work and whether it had an impact on her leaving, and

16   discussing Plaintiff's past work performance with her employer.  R. 412.  Prudential did not

17   undertake any of these measures; instead, Prudential denied Plaintiff's claim the next day, on

18   November 23, 2010.  R. 478.  The denial of benefits letter relied heavily on Nurse Krier's

19   findings.

20                    **2.      Dr. Borigini's Independent Medical Review**

21       Dr. Borigini, a board-certified rheumatologist, reviewed Plaintiff's claim file and issued a

22   six-page report on February 7, 2012.  R. 110.  Dr. Borigini relied on the fact that Plaintiff's pain

23   was "controlled" at various times, and that she was "enjoying her time off" in concluding that

24   Plaintiff was not disabled.  R. 111.  Dr. Borigini's report states that a review of Plaintiff's medical

25   records did not reveal "compromises in neurologic functioning or joint ranges of motion" and that

26   "[f]atigue appears to be the main issue . . . ."  R. 113.  Dr. Borigini decided not to credit the Pacific

27   Fatigue Laboratory report because "the exercise study performed is not generally considered part

28   of the evaluation of fibromyalgia and CFS; In fact, a study published several years ago concluded

United States District Court
Northern District of California

10

United States District Court
Northern District of California

that there appears to be a major contribution from avoidance behavior in terms of deconditioning, supporting the cognitive-behavioral model of CFS." Id.  The study Dr. Borigini referenced was published in 1997 in the Journal of Psychosomatic Research.  Dr. Borigini continued: "I will defer to the appropriate specialist regarding cognitive and psychiatric issues." Id.

### 3.      Dr. Borigini's Supplemental Medical Review

Prudential asked Dr. Borigini a series of follow-up questions on March 1, 2012, which were answered in a report dated March 13, 2012.  R. 15.

First, Dr. Borigini was asked to clarify his findings in light of Dr. Silverman's report, and to explain "how he arrived at such a difference of opinion than Dr. Silverman." R. 16.  Dr. Borigini responded that he was asked to review the file as a rheumatologist, and that he "did not see documentation of joint pathology or muscle pathology that would cause limitation in range of motion or weakness of muscle groups that would impact physical functioning.  I did, and will continue to, defer conclusions regarding cognitive dysfunction to the appropriate neuropsychological consultants.  In addition, I would defer conclusions regarding 'unpredictable fatigue' and pain to mental health specialists; the claimant has these symptoms, but we have no clinical signs or laboratory testing to explain why." Id.

Second, Dr. Borigini was asked if there are "any more recent medical opinions concerning the validity" of the tests administered by the Pacific Fatigue Laboratory than the fifteen-year-old study Dr. Borigini had cited in his first report.  Additionally, Dr. Borigini was asked to discuss the actual results of the Pacific Fatigue Laboratory testing and to provide his opinion as to why they do or do not support a finding of functional impairment.  Id.  Dr. Borigini responded: "I cited literature to support my opinion, and am not aware of robust published literature that concludes otherwise . . . .  The fatigue evaluation based its conclusion on oxygen consumption measurements, and thus I would suggest a consultation with an expert in oxygen consumption.  This is not part of the training of a rheumatologist in the United States." Id.  Dr. Borigini did not discuss the actual results of the exercise test or provide further opinion as to why the results do not support a finding of functional impairment.

Third, Dr. Borigini was asked to consider the statements submitted by Plaintiff and her

11

significant other.  Dr. Borigini responded in pertinent part: "I render opinions on restrictions/disability based on clinical measures, which in turn are undertaken after the claimant gives a history of the complaints.  This claimant had testing and physical examinations performed to document the clinical findings; and these findings, in my opinion, do not translate into 'permanent disability.'"  Id.

### 4.  Dr. Acenas' Independent Medical Review

Dr. Acenas, a psychiatrist, reviewed Plaintiff's claim file and issued a five-page report on February 7, 2012.  R. 103.  Dr. Acenas concluded: "Based on the medical documentation reviewed and from a psychiatric perspective, the claimant has no psychiatric impairment supporting any medically necessary restrictions and/or limitations causing her mental or cognitive impairment from 3/15/10 through 9/11/10 and from that date forward."  R. 105.  Dr. Acenas relied primarily on Dr. Paladugu's notes, which indicated that Plaintiff was "stable" on her medications.  Dr. Acenas did not believe Plaintiff's anxiety and depression were severe enough to cause psychiatric impairment.

### 5.  Dr. Acenas' Supplemental Medical Review

Prudential asked Dr. Acenas a series of follow-up questions on March 1, 2012, which were answered in a report dated March 19, 2012.  R. 8.  In relevant part, Dr. Acenas was asked to review the statements submitted by Plaintiff and her significant other.  Dr. Acenas confirmed her original finding that Plaintiff did not suffer from a psychiatric impairment, while recognizing that Plaintiff and her significant other identified limitations unrelated to psychiatric impairment.

### F.  Appeal Denial

Plaintiff's appeal of the denial of her initial disability claim was denied on February 28, 2012.  R. 447.  The decision relied primarily on the medical reviews and file review performed by Nurse Krier and Doctors Borigini and Acenas, and on the conclusion that Plaintiff's subjective reports of impairment were not supported by diagnostic and clinical testing.  The decision states: "We have determined that the medical evidence in the file, specifically upon diagnostic testing and physician exam findings, does not support the need for any medically supported restrictions or limitations in her physical, psychiatric or cognitive functioning."  R. 451–52.

United States District Court
Northern District of California

12

## II.     LEGAL STANDARD

The Employment Retirement Income Security Act ("ERISA") provides claimants with a federal cause of action to recover benefits due under an ERISA plan. 29 U.S.C. § 1132(a)(1)(B). The parties in this case have stipulated to a *de novo* standard of review.  To evaluate a claim *de novo*, courts conduct a Rule 52 bench trial based on the administrative record, and must determine whether the plaintiff is disabled.  Kearney v. Standard Ins. Co., 175 F.3d 1084, 1094–95 (9th Cir. 1999) (en banc).  Courts evaluate the persuasiveness of conflicting testimony and make findings of fact.  The bench trial may "consist[] of no more than the trial judge reading [the administrative record]."  Id. at 1095.

Plaintiff bears the burden of showing, by a preponderance of the evidence, that she was disabled under the terms of the plan during the claim period.  Wiley v. Cendant Corp. Short Term Disability Plan, No. 09-cv-00423-CRB, 2010 WL 309670, at *7 (N.D. Cal. Jan. 19, 2010).

## III.    ANALYSIS

"[F]ibromyalgia's cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. . . .  Objective tests are administered to rule out other diseases, but do not establish the presence or absence of fibromyalgia."  Jordan v. Northrop Grumman Corp. Welfare Benefit Plan, 370 F.3d 869, 872 (9th Cir. 2004) overruled on other grounds by Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 969 (9th Cir. 2006).  Nevertheless, fibromyalgia is a physical, rather than mental disease, subject to standard diagnostic criteria promulgated by the American College of Rheumatology.  Id. at 872–73.  Courts, including this Court in its earlier Order granting Plaintiff partial summary judgment concerning the self-reported symptoms limitation contained in the Plan, have recognized standard clinical examinations, such as the eighteen-point trigger test, as means of diagnosing fibromyalgia.  Order, ECF No. 50.

Likewise, "[t]here is no blood test or other objective laboratory test for chronic fatigue syndrome."  Salomaa v. Honda Long Term Disability Plan, 642 F.3d 666, 676 (9th Cir. 2011). "The standard diagnosis technique for [chronic fatigue syndrome] includes testing, comparing symptoms to a detailed Centers for Disease Control list of symptoms, excluding other possible

disorders, and reviewing thoroughly the patient's medical history." <u>Id.</u> (quotation omitted).

The Ninth Circuit has repeatedly held that "the lack of objective physical findings" is insufficient to justify denial of disability benefits. <u>Salomaa v. Honda Long Term Disability Plan</u>, 642 F.3d 666, 669 (9th Cir. 2011). <u>See also</u> <u>Benecke v. Barnhart</u>, 379 F.3d 587, 590 (9th Cir. 2004). A disability plan's reliance on normal diagnostic or clinical results in the face of credible evidence suggesting impairment due to fibromyalgia or chronic fatigue is an abuse of discretion. <u>Salomaa</u>, 642 F.3d at 676. The court in <u>Salomaa</u> summarized the dynamics attendant in a claim for disability benefits based on chronic fatigue and fibromyalgia as follows:

> One can understand the frustration of disability plan administrators with claims based on such diseases as chronic fatigue syndrome and fibromyalgia. Absence of objective proof through x-rays or blood tests of the existence or nonexistence of the disease creates a risk of false claims. Claimants have an incentive to claim symptoms of a disease they do not have in order to obtain undeserved disability benefits. But the claimants are not the only ones with an incentive to cheat. The plan with a conflict of interests also has a financial incentive to cheat. Failing to pay out money owed based on a false statement of reasons for denying is cheating, every bit as much as making a false claim . . . . Many medical conditions depend for their diagnosis on patient reports of pain or other symptoms, and some cannot be objectively established until autopsy. In neither case can a disability insurer condition coverage on proof by objective indicators such as blood tests where the condition is recognized yet no such proof is possible.

<u>Id.</u> at 678.

In <u>Salomaa</u>, the Ninth Circuit directed an award of benefits to a claimant with chronic fatigue syndrome. The court held that the disability plan had abused its discretion in denying benefits, in part because the plan (1) relied on internal file reviews rather than the records from the doctors who personally examined the claimant and found the claimant to be disabled, and (2) demanded "objective tests to establish the existence of a condition for which there are no objective tests." <u>Id.</u> at 676. The claimant in <u>Salomaa</u> had been examined by four physicians and two psychologists, and had undergone tests to rule out malingering. Each physician concluded that the claimant was "totally disabled." "Not a single physician who actually examined Salomaa concluded otherwise. The only documents with an 'M.D.' on the signature line concluding that he

United States District Court
Northern District of California

1   was not disabled were by the physicians the insurance company paid to review his file.  They

2   never saw Salomaa." Id.

3          The facts of this case mirror those in Salomaa.  Though Salomaa's disability was

4   apparently more severe than Plaintiff's, the medical evidence, taken as a whole, establishes that

5   Plaintiff was and is disabled within the meaning of the terms of the Plan.

6          Prudential does not dispute that Plaintiff was diagnosed with chronic fatigue syndrome and

7   fibromyalgia.  Instead, Prudential's position is that Plaintiff's medical records reveal her condition

8   was "stable" and "controlled" at the time she stopped working, despite the diagnosis.  Prudential

9   supports its position through selective quotation from the record and by conflating pain and

10  fatigue.  Each of Plaintiff's three treating physicians continuously noted Plaintiff's fatigue and

11  exhaustion, as did Dr. Silverman and the Pacific Fatigue Laboratory.  The medical records also

12  establish that Plaintiff's condition progressively worsened prior to her leaving work due to her

13  colon surgery and broken rib, which triggered a downward spiral in her level of energy that led to

14  significant functional impairment.  The statements submitted by Plaintiff and her significant other

15  also support for Plaintiff's position.  While the pain associated with Plaintiff's condition appears

16  to have been "controlled" at different times throughout the years prior to her leaving work, the

17  evidence is clear that she continuously suffered from fibromyalgia and had difficulty functioning;

18  and while her mental condition was "stable," her fatigue was not.

19         Prudential's internal file review and two independent medical reviews suffer from several

20  deficiencies that require the Court to give them less weight than Plaintiff's medical evidence.

21  Most importantly, as in Salomaa, none of Prudential's consultants examined Plaintiff – although

22  they could have.  While Prudential was not required to base its decision solely on the records from

23  Plaintiff's treating physicians, courts routinely weigh such records more heavily than they do

24  reports and file reviews from paid consultants who never examine the claimant or talk to the

25  claimant's treating physicians.  See, e.g., Salomaa, supra; Minton v. Deloitte & Touche USA LLP

26  Plan, 631 F. Supp. 2d 1213, 1219–20 (N.D. Cal. 2009); Heinrich v. Prudential Ins. Co. of Am.,

27  No. 04-cv-02943-JF, 2005 WL 1868179, at *8 (N.D. Cal. July 29, 2005) ("Of particular

28  significance is the fact that Prudential's physicians never examined Heinrich or even spoke to

United States District Court
Northern District of California

Heinrich's physicians . . . . [T]he failure of Prudential's physicians to perform their own examinations of Heinrich entitles their opinions to less weight, because fibromyalgia produces symptoms that must be reported by the patient to the physician and that can be evaluated more fully through an actual examination than by a mere review of a patient's medical record.").[3]

In addition, the reports produced by Nurse Krier and Dr. Borigini must be accorded less weight because they demand diagnostic and clinical confirmation of a condition that cannot be confirmed through such results.  See Duncan v. Cont'l Cas. Co., No. 96-cv-2421-SI, 1997 WL 88374, at *5 (N.D. Cal. Feb. 10, 1997) (Plan "may not deny [plaintiff's] claim because her physician cannot provide physiological proof where the physical condition is such that physiological proof is not available."); Minton, 631 F. Supp. 2d at 1219 (Internal medical consultant "rendered his opinion based on a lack of evidence that one would not expect to find in the first place.").

Nevertheless, Plaintiff attempted to provide objective evidence of her condition through the eighteen-point trigger test administered by Dr. Silverman and the exercise stress test administered by the Pacific Fatigue Laboratory.  Dr. Borigini ignored the stress test based on a fifteen-year-old journal article in a manner that "reflects a belief that pain that is not supported by objective findings can never be so severe as to interfere with one's ability to function in the workplace."  Minton, 631 F. Supp. 2d at 1220.  When asked to explain, Dr. Borigini could not

---

[3] See also Williams v. Hartford Life & Acc. Ins. Co., C2-08-128, 2009 WL 3127761 (S.D. Ohio Sept. 25, 2009):

> Each of the three medical experts Hartford hired was employed by the same company, MES Solutions. None of Hartford's hired consultants conducted a physical examination of Plaintiff. Hartford's decision to give more weight to a non-treating physician's opinion for no apparent reason lends force to the conclusion that Hartford's decision to deny Plaintiff's claim was arbitrary and capricious. While Hartford had no duty to give deference to Plaintiff's treating physicians, as a fiduciary, it cannot simply disregard these findings for more favorable opinions of its paid consultants.

Id. (citation omitted).

United States District Court
Northern District of California

1    provide more recent authority discrediting the stress test, and failed to analyze the results of the

2    test themselves.  Instead, he suggested "a consultation with an expert in oxygen consumption"

3    because the subject "is not part of the training of a rheumatologist in the United States."  R. 16.

4    Dr. Borigini also ignored the eighteen-point trigger test as subjective.  The Court finds Dr.

5    Borigini's justification for doing so unpersuasive.  The trigger test is a standard clinical

6    examination recognized by courts in diagnosing fibromyalgia, and the stress test produced results

7    from physical testing that Dr. Borigini failed to evaluate on their merits.

8         Nurse Krier's report based its conclusions on an incomplete record; she did not have the

9    benefit of Dr. Silverman's report, the Pacific Fatigue Laboratory report, or the statements

10   submitted by Plaintiff and her significant other.  Moreover, Nurse Krier recommended that

11   Prudential examine further the nature of Plaintiff's functional capacity prior to rendering a

12   decision, but Prudential ignored that recommendation.  As is now clear, such an examination was

13   then performed – and it revealed credible evidence of impairment.

14        As for Dr. Acenas' report, the Court finds that it is immaterial to Plaintiff's contention that

15   her fatigue rendered her disabled, as Dr. Acenas examined the record only to determine whether

16   Plaintiff suffered from a psychiatric impairment such as depression or anxiety.  Plaintiff does not

17   contend here that she suffers from such an impairment.

18        In short, the Court concludes that the position taken by Nurse Krier, Dr. Borigini, and

19   Prudential sets a "threshold that can never be met by claimants who suffer from fibromyalgia or

20   similar syndromes, no matter how disabling the pain."  Id.  This artificially high threshold

21   conflicts with numerous decisions that have found, on similar facts, that disability claims based on

22   fibromyalgia and chronic fatigue syndrome may be premised on subjective evidence and the

23   reports of treating physicians.  See id.; Salomaa, 642 F.3d at 669; Duncan, 1997 WL 88374, at *5;

24   Heinrich, 2005 WL 1868179, at *8 ("[T]he fact that Heinrich's physicians could not use a

25   completely objective test to evaluate the severity of her fibromyalgia does not undermine their

26   considered medical opinions, based on their in-person examinations, that her condition rendered

27   her incapable of performing her occupation."); May v. Metro. Life Ins. Co., No. 03-cv-5056-CW,

28   2004 WL 2011460 (N.D. Cal. Sept. 9, 2004).  That evidence, which the Court finds to be the more

1    credible, establishes that Plaintiff suffers from severe fatigue and fibromyalgia that render her

2    unable to work.

3    **IV.     CONCLUSION**

4           Upon *de novo* review of the record, the Court finds that Plaintiff was disabled within the

5    meaning of the LTD Plan for the duration of the elimination period and was entitled to disability

6    benefits.  The parties shall, within thirty days of the date of this Order, (1) meet and confer to

7    resolve the amount of disability benefits due Plaintiff for the "own occupation" period, and (2)

8    submit a proposed judgment consistent with the terms of this Order.

9           The Court will not address the parties' arguments concerning the "any occupation" term of

10   the Plan, which affects whether Plaintiff was entitled to benefits beyond the first twenty-four

11   months following the date of disability, as Prudential did not, in the first instance, make a

12   determination on that question.  Instead, the Court hereby ORDERS that Prudential determine

13   whether Plaintiff is entitled to benefits under the "any occupation" term of the Plan, consistent

14   with the terms of this Order, within ninety days of the date of this Order.  See <u>Heinrich</u>, 2005 WL

15   1868179, at *9; <u>Allenby v. Westaff, Inc.</u>, No. 04-cv-2423-TEH, 2006 WL 3648655, at *8 (N.D.

16   Cal. Dec. 12, 2006).

17          **IT IS SO ORDERED.**

18   Dated:  January 22, 2014

19   

20                                        JON S. TIGAR
                                          United States District Judge

21

22

23

24

25

26

27

28

United States District Court
Northern District of California